IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON

_____

JUDY PLUNK, who sues as
Administratrix of the Estate of
JERRY L. PLUNK, deceased,
for the benefit of herself under
Title 45 U.S.C. Section 51, and,
for the benefit of the Estate under
Title 45 U.S.C. Section 59,

       Plaintiff,

v.

ILLINOIS CENTRAL RAILROAD,
A Corporation,

       Defendant.

Shelby Circuit No. 62261
   C.A. No. 02A01-9707-CV-00167

# FILED

**May 8, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

Hon. John R. McCarroll, Jr., Judge

STEPHEN R. LEFFLER, Memphis, TN, and FRANK O. BURGE, JR., Birmingham, AL,
Attorneys for Plaintiff.

GARY K. SMITH, HAROLD W. MCLEARY and BRYAN C. WITT, Shuttleworth, Smith,
Williams, Sabbatini & Harper, Memphis, Attorneys for Defendant.

*REVERSED AND REMANDED*

Opinion filed:

_____

**TOMLIN, Sr. J.**

      Judy Plunk ("plaintiff") as administratrix of her husband's estate, filed suit in the Circuit

Court of Shelby County pursuant to the Federal Employer's Liability Act, (FELA) against the

Illinois Central Railroad ("defendant" or "railroad") seeking damages stemming from the death

of her husband, Jerry Plunk ("decedent"), who was the engineer of a train owned and operated by

defendant that was involved in a head-on collision with another train.  The case was tried by a

jury.  At the conclusion of plaintiff's proof and again at the conclusion of all the proof, defendant

made a motion for a directed verdict which was overruled each time by the trial court.  The case

was submitted to the jury, who found plaintiff's decedent 70% negligent and defendant 30%

negligent in causing the collision, and awarded plaintiff $285,000.00 as damages.  On appeal

defendant has raised five issues for our consideration: whether the trial court erred in (1) failing

to grant defendant's motion for directed verdict on the ground that decedent was the sole cause of

the accident; (2) admitting into evidence testimony of plaintiff's expert, Dennis Runcie; (3)

allowing other railroad employees to testify as "experts" regarding "good railroad practice"; (4)

admitting into evidence testimony of plaintiff's economist expert, Fred Johnson; and (5) failing

to order plaintiff's counsel to dismiss with prejudice allegations of defendant's vicarious liability in two collateral cases pending in Mississippi and to cease representation of certain plaintiffs in the Mississippi litigation. For the reasons hereinafter stated, we reverse in part and remand this case to the trial court for a new trial in keeping with the provisions of this opinion.

We will proceed to discuss pertinent background facts as well as the material facts directly related to the issues raised. At the time of the accident, plaintiff's decedent was employed as a locomotive engineer for defendant railroad. His employment called for him to make regular round trips from Jackson, Mississippi to Memphis. On the day of the accident, two of defendant's freight trains were involved in a head-on collision at Flora, Mississippi. Plaintiff's decedent was the engineer on the northbound train, #6131. The conductor was Royce E. Crowley. The southbound train, #6152, had as its crew Q. B. Gray, engineer, and William Gandy, conductor.

Prior to the collision, Plunk and Crowley received a "meet order" from the Illinois Central dispatcher, the substance of which was that their northbound train was to stop at Cynthia, Mississippi until the approaching southbound train passed by. Plaintiff's decedent, who was at the controls at the time of the accident, failed to comply with the meet order and drove train #6131 past Cynthia, without waiting for the arrival of #6152. The trains collided just north of Cynthia, near Flora, resulting in the death of plaintiff's decedent.

Plaintiff subsequently filed this suit. In her complaint she alleged that defendant was guilty of several acts of negligence, to wit: the negligence of its employees, its signal system, its dispatch communication practices, the workload it assigned to decedent and the defendant's general work and safety practices. In its answer, defendant denied all liability, alleging that the sole cause of the collision and the resulting death of decedent was the negligence of decedent himself in failing to observe, if not willfully disobeying, the meet order issued by defendant's dispatcher. This appeal followed.

## I. The Directed Verdict Issue.

Before addressing this issue directly, it would be helpful to develop some of the undisputed facts as background in the operation of defendant's railroad. At the time of the accident decedent and his conductor were working in the Yazoo District in the state of

2

Mississippi. The Yazoo District is known as "dark territory" in railroad slang, inasmuch as there are no warning or signal lights along the tracks as there are in some other districts of the railroad. In this district, defendant utilized special procedures and rules in order to insure the safety of the operation of their trains. Many of these rules involve the movement of its trains.

For instance, when a train is in a train yard it is under the control of the yardmaster, who directs the train's movements within that yard. In order to leave a train yard, the train must have the authority to do so. This authority comes from the dispatcher who is covering the specific district into which the train is to travel. When the train moves out of a train yard, it goes out from under the control of the yardmaster and under the control of the dispatcher. By the same token, when a train arrives at its train yard destination, the train moves out from under the control of the dispatcher and into the control of the yardmaster of the yard which it is entering. All such communication with the yardmaster and/or the dispatcher takes place by radio, one of which is located in the cab of one of the engines.

When a dispatcher is faced with giving authority to a train to move within dark territory, it issues what is called a "track permit." The track permit provides the only authority by which a crew can move its train from one train yard to another. Without a valid track permit, the crew of the train has no authority to move that train outside the boundaries of the train yard within which it is then located. When the time comes for the issuance of a track permit to a train, the dispatcher reads the contents of the permit over the radio to the conductor of the train, whereupon the conductor records it on a form issued by the railroad. The conductor is then required to read the contents of the track permit back to the dispatcher, word for word, for the purpose of verifying its accuracy. Once the conductor on the train has received and properly verified a track permit, the permit is given effect and it is copied and posted in the cab of the engine in front of and in full view of the engineer.

On the day of the accident, decedent and Crowley were the only crew members of #6131, scheduled to travel northbound from Jackson, Mississippi to Memphis. Quite often, trains have two or more locomotives in tandem to supply sufficient power to the trains to pull the cars making up the train. This combination of two or more engines is called a "consist." A train is normally identified by the number of the first locomotive in the consist. However, no matter where the locomotive is located in the consist, only one locomotive number is used to identify

3

the train. On this date, the number of the lead locomotive was #6131, thus the train was referred to as train #6131. The last locomotive in the consist, if its number is not used as the identification for the train itself, is referred to as the "trailing" locomotive.

While decedent and Crowley were assembling the cars of their train in the Jackson train yard, they received a track permit by radio from the dispatcher. This track permit was permit no. 54. It contained a "meet order." A "meet order" is an order within a track permit issued by the dispatcher to inform the crew that its train is scheduled to meet another train while en route to its destination. This meet order, also called a "line 3" because of its location within the track permit, establishes which train has priority and when and where the subordinate train must wait for the primary train to pass. The meet order directed their train, #6131, to wait at Cynthia, a station north of Jackson, and to allow a southbound train, #6152, en route to Jackson, to pass by before proceeding further. Northbound train #6131 was the subordinate train and southbound train #6152 was the primary train.

Conductor Crowley testified that a few minutes prior to receiving the track permit containing the meet order, both he and decedent overheard an unidentified voice on the railroad radio stating that there was a train in the Jackson yard that had locomotive #6152 "trailing." In railroad lingo, this would seem to indicate that locomotive #6152 was the second or at least a "following" engine in a train then located in the Jackson yard.

In FELA cases, federal law controls as to all matters of substantive law. See Palmer v. Norfolk-Southern Ry. Co., No. 03A01-9309-CV-00313, 1994 WL 111037, at *2 (Tenn. Ct. App. March 30, 1994), *perm. app. denied*, (Tenn. Aug. 22, 1994) (citations omitted). While federal law governs the substantive rights of the parties, procedural matters are governed by applicable state rules when the case is tried in state courts. Mitchell v. Missouri-Kansas-Texas R.R. Co., 786 S.W.2d 659, 661 (Tex. 1990).

In considering a motion by a party seeking a directed verdict, the law of this state requires that first the trial judge, and then the appellate courts, take the strongest legitimate view of the evidence presented in favor of the opponent to the motion, allowing all reasonable inferences in his or her favor, at the same time discarding all countervailing evidence. Flynn v. Shoney's, Inc., 850 S.W.2d 458, 459-60 (Tenn. Ct. App. 1992). Where there is any doubt as to the conclusions to be drawn from the whole evidence, the motion should be denied. A verdict should not be

directed during, or after, trial except where reasonable minds could draw but one conclusion. Holmes v. Wilson, 551 S.W.2d 682, 685 (Tenn. 1977).

In seeking to have this court reverse the trial court and dismiss plaintiff's suit, defendant relies on four U. S. Supreme Court cases, all decided between 1924 and 1932. Two of those cases, most frequently sighted for the proposition advocated by defendant, are Davis v. Kennedy, 266 U.S. 147, 45 S.Ct. 33, 69 L.Ed. 212 (1924), and Unadilla Valley Ry. Co. v. Caldine, 278 U.S. 139, 49 S.Ct. 91, 73 L.Ed. 224 (1928). All four of these cases were suits brought pursuant to the provisions of the FELA. This act, among other important steps, abolished the fellow servant rule, substituted comparative negligence for the strict rule of contributory negligence and allowed survivors to bring an action for tort liability. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 62, 63 S.Ct. 444, 448-49, 87 L.Ed. 610, 615 (1943). As the act was later interpreted, it required a careful distinction between assumption of risk and contributory negligence, since assumption of risk was an absolute bar to recovery while contributory negligence merely reduced the amount of recovery. Id. at 62-63.

The assumption of risk clause led to much litigation. In addition to the difficultly in distinguishing between contributory negligence and assumption of risk other problems arose, one of which was the application of the "primary duty rule," in which contributory negligence through the violation of a company rule became assumption of risk. Such was the basis for the supreme court's ruling in Unadilla Valley Ry. Co. and Davis. See Tiller, 318 U.S. at 63.

In 1939, section 54 of the FELA was amended to read as follows (The 1939 amendment added the underlined language):

> In any action brought against any common carrier under or by virtue of any of the provisions of the Act [45 USCS §§51] to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; and no employee shall be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.
> 45 U.S.C.S. § 54 (emphasis supplied).

Tiller was the first U.S. Supreme Court case to interpret the scope and effect of the 1939 amendment to the FELA. Briefly stated, the facts in Tiller were these: Tiller, a railroad security

5

officer, was inspecting the seals of a train moving slowly on one track when he was hit and killed by the rear of a train backing the opposite direction on another track. Defendant pled contributory negligence as well as a separate defense that plaintiff had assumed all the risks necessary to his employment. The trial court granted a directed verdict which was affirmed by the Court of Appeals. In reversing the Court of Appeals and remanding the case for a new trial, the Supreme Court stated in part:

> We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment, and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open the identical defense for the master by changing its name to "non-negligence."
> Tiller, 318 U.S. at 58.

Later in the opinion, shortly after its consideration of Unadilla Valley R. Co. and Davis, the Court stated the following:

> It was this maze of law which Congress swept into discard with the adoption of the 1939 amendment to the Employers' Liability Act, releasing the employee from the burden of assumption of risk by whatever name it was called. The result is an Act which requires cases tried under the Federal Act to be handled as though no doctrine of assumption of risk had ever existed.
> Tiller, 318 U.S. at 64.

Further on, the court said:

> In this situation the employer's liability is to be determined under the general rule which defines negligence as the lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done.
> Id. at 67 (footnote omitted).

The principles laid down by the Supreme Court in Tiller were considered in Atlantic Coast Line R. Co. v. Mangum, 34 So.2d 848 (Ala. 1948). The facts in that case were quite similar to the facts in the case at bar. The crew of a train of defendant's railroad were given instructions, through a dispatcher to the conductor, which were conveyed to all five members of the crew, that there were two trains proceeding in the opposite direction toward this train and that the subject train was directed to take a siding at a certain location to permit the trains from the opposite direction to clear. The record reflects that the train took the siding, and permitted the first train to pass by. It appeared from the proof that all of the crew forgot about the second train coming toward them whereupon the engineer started up the train and proceeded off the siding

6

onto the main line, where it collided with the oncoming train, killing the engineer. The jury returned a verdict in favor of the estate of the engineer against the railroad.

In Atlantic Coast Line R. Co., *supra*, counsel for plaintiff conceded that without the force and effect of the amendment of 1939, abolishing the defense of assumption of risk, decisions of the United States Supreme Court were such that plaintiff would have no right of action. He was referring to the Davis and Unadilla Valley R. Co. opinions. In addition, the Atlantic Coast Line R. Co. case cited with approval the case of Keith v. Wheeling L. & E. R.R. Co., 160 F.2d 654 (6th Cir. 1947), holding that it was clear in Tiller that the Supreme Court had destroyed the primary duty rule under those circumstances, as a consequence of the 1939 amendment eliminating assumption of risk as a defense. The Alabama court noted that the Keith case cited many opinions of the Supreme Court that:

> point out that the question of liability now is one for the jury where there is any evidence of negligence on the part of other agents or employees of the defendant, which may be found by the jury either in part [or] in whole to have been the cause of the injury or death involved.
> Atlantic Coast Line R. Co., 34 So.2d at 852.

The following excerpts from the testimony of conductor Crowley show clearly what took place in the cab of #6131 on that fateful day:

Q  So, the engineer is the one driving the train; right?
A  That's right.
Q  And you want the track permit in front of the person driving the train; right?
A  That's right.
Q  Where it went on this day was right in front of the man driving the train. Mr. Plunk, right?
A  That's right.
Q  He's got a place up there where he can put it up there, hold it and put it stationary, and it is always right there in front of him and he is looking at it?
A  That's right.
Q  That was never moved from that spot right in front of him on February 26, 1994 as far as you know, was it?
A  As far as I know.
Q  When you got track permit 54, and we have been over it and are going to go over again some of the provisions in here, it tells you, you've got a line 3, and that line 3, and that line 3 means that you're going to have a meet at Cynthia when you get up there; correct?
A  That's what it says.
                                    . . . .

Q  When you receive a track permit, such as track permit 54, no one    on that train, including you or the man driving it, Mr. Plunk, has     the authority to ignore

7

the terms of that permit, do you?

A      Unless we think it is fulfilled.

Q      Well, if a track permit is fulfilled, you are not ignoring its terms, are you?

A      That's right.

Q      If a track permit is fulfilled, that means you have complied with it; correct?

A      That's correct.

Q      All right. So, let's don't talk about fulfilling it, let's talk about just ignoring what it says. You would agree with me that nobody on that train or any train has the authority to ignore the terms of a track permit? You would agree with that, wouldn't you?

A      That's right.

Q      No one on that train, this train or any other train, has authority to violate the terms of a track permit, do you?

A      That's right.

Q      You agree?

A      That's right.

Q      You would also agree with me, looking back on it now, that train 6131 north did not comply with that line 3 of track permit 54? Agreed?

A      We thought we did.

Q      But you didn't, did you?

A      Well, it ended up we didn't, but we thought we did.

Q      But the fact of the matter is if train 6131 north, your train, being driven by Jerry Plunk with you as conductor, had stopped at Cynthia the way that line 3 says for you to do for a meet, the wreck would never have happened, would it?

A      Well, in hindsight that would have to be correct, I guess.

Q      What line 3 tells you other than the fact that you were going to have a meet is it tells you you are going to have a meet with a specific train that is north of Cynthia, and that specific train is 6152; correct?

A      That's right.

Q      Now, you had some discussion about this on Thursday. It doesn't say how far north of Cynthia 6152 [is], it just tells you it is north of Cynthia; right?

A      That's right.

Q      So that when you got track permit 54 down here around Halston     and Rick Orel [the dispatcher] tells you that you are to have a meet, you will have a meet with 6152 at Cynthia, as far as you knew right at that moment, assuming that he is right, that he's got a 6152 up there southbound north of Cynthia, for all you know at that moment you may get to Cynthia and you may see 6152 sitting on that crossing and waiting on you, or you may not see 6152 at all, it hasn't gotten there yet. Those are the two possibilities that that track permit tells you; isn't that right?

A      According to the permit, yes, sir.

Q      So, if you get up here on your train to Cynthia and you don't see     under that permit 6152 sitting here on the siding, and what that                 track permit now tells you is he is up here somewhere out of your sight coming at you; that's what the permit tells us, isn't it?

A      That's the purpose of the permit, yes, sir.

Q      That's what the permit tells us at that point, isn't it?

A      That's right.

Q      What that permit tells us with this 6152 up here somewhere         coming towards you out of sight is do not drive train 6131 through Cynthia and continue north? That is what the permit         tells us, doesn't it?

A      That's what the permit means, yes, sir.

Q      In spite of the fact that's what that permit means, Mr. Plunk         drove the 6131 north through Cynthia without stopping on February 26, 1994, didn't he?

A      He went past Cynthia, yes, sir.

Q    My question is Mr. Plunk drove the 6131 north through Cynthia without stopping, didn't he?

A    That's right.

Q    Your train from the time you pulled out of Jackson yard never stopped; isn't that right?

A    That's right.

. . . .

Q    Okay. Fine. When the decision was made on February 26, 1994 not to stop at Cynthia, as per line 3 on track permit 54, you were not the person who came up with that idea, were you?

A    No, sir.

Q    And how many people were on that train? Just you and Mr. Plunk; right?

A    That's right.

Q    Now, after Mr. Plunk went by Cynthia without stopping the train in violation of line 3 of track permit 54, you didn't make him stop, did you?

A    No, we didn't stop at Cynthia.

Q    And you didn't stop anywhere else until that head-on occurred, did you?

A    No, sir.

Q    So, I guess my next inquiry would be if you didn't come up with the idea not to stop, then when was the decision made, and it would be your testimony in front of this jury that the train 6131 on which you were the conductor and Mr. Plunk was the engineer, when it left down here around Halston getting its track permit, it never intended to stop at Cynthia according to line 3 of track permit 54; isn't that true?

A    Well, the decision had been made when he got the permit that we felt that we had met the train in the yard.

Q    All I'm asking you right now is when the decision was made not to stop at Cynthia. And your testimony is the decision not to stop at Cynthia was made on train 6131 back here at the time you got the permit at Halston?

A    No, sir. Not all the way, no.

Q    All right. So, you tell me when it was as far as you know, if you know. Maybe I'd better clarify that. Do you know when the decision was made not to stop that train at Cynthia in accordance with line 3 of permit 54?

A    Yes. At Cynthia.

. . . .

Q    So, as you were approaching Cynthia you're still of a mind to do what line 3 says; is that right?

A    No, we didn't. We felt we had already met that train.

Q    Well, what is going on in terms of information that you have or don't have as you're approaching Cynthia that is influencing whether or not you are going to stop the way the track permit tells you?

A    Well, I relied upon the information of my fellow employees.

Q    All right.

A    As to whether we should stop or continue.

Q    So, you relied on Mr. Plunk's judgment as to whether or not you should stop or continue in accordance with line 3 of track permit 54 when you got to Cynthia?

A    Absolutely.

Q    Absolutely. That's the long and short of it, isn't it, Mr. Crowley?

A    Yes, sir. Well, the decision was made together.

9

Q   But you relied on what?  You relied on Mr. Plunk?
A   Yes, sir.
Q   You acquiesced to Mr. Plunk?
A   Yes, sir.
Q   Or I guess stated differently, you deferred to Mr. Plunk on that  and the train kept going?
A   Yes, sir.
Q   You did have authority as the conductor of the train to stop it, of course?
A   Yes, sir.
Q   But you did not?
A   No, sir.
Q   Again, because you were deferring to your co-employee, Mr.  Plunk?
A   Yes, sir.

. . . .

Q   Well, when you take [a] track permit then, which you have already acknowledged is the authority and the only authority to move that train, Rick Orel [the dispatcher] gives it to you, and you now acknowledge that he gave you correct information and a correct track permit, you read it back to him over the radio to make sure that you and he have the same information; right?
A   That's correct.
Q   And I believe you told us this Thursday, you did that.  You didn't say to him oh, by the way, Rick, why are you giving me a line 3  to meet train 6152 south at Cynthia?  That train is already in the yard.  You didn't do that, did you?
A   You don't interrupt him when he is giving it to you.
Q   You didn't do it, did you?
A   No.
Q   After he gave it to you and you are reading it back, you didn't say  Rick, there's got to be some mistake.  6152 is already down in the  yard.  You didn't do that, did you?
A   No, sir.
Q   In addition to reading it back to him, you write it down and you  give that to Mr. Plunk; right?
A   That's right.
Q   And after you have read it back and Rick Orel hears you say to  him the same things that he has said to you, and when he hears  that you have given him back correct information, he gives you  this okay time, which happened to occur at 1:16 p.m., and that effectuates that track permit?
A   That's correct.
Q   So, not only in this case do we now know from you that Rick  Orel gave a correct track permit to you, we now know that you understood that correct track permit; right?
A   Well, I understood [what] it was supposed to be, yes, sir.
Q   In other words, you understood what he said; you didn't misunderstood [sic] anything that he said?
A   No, sir.
Q   From Halston at or about mile marker 215 to Flora, somewhere  around mile marker 202, some 13 miles, the train 6131 never  said to Rick Orel you line 3 information is wrong or we want to  know for sure if it is wrong; that never happened, did it?
A   No to my knowledge, no.
Q   You could have -- and when I say you, I'm talking about 6131 --  6131 could have, between Halston and Cynthia, or for that matter between Cynthia and Flora, contacted the dispatcher and asked for clarification of line 3 before you went by Cynthia; true?

10

A    Well, that's true.

Q    If for some reason you made that decision just before you got to Cynthia, and you want clarification of line 3, and you want it from the dispatcher, you can stop and talk to the dispatcher, can't you?

A    We could have, sure.

Q    But you didn't, did you?

A    No, we didn't.

Q    If there is a question about whether or not the information on the line 3 meet is accurate, a safer course would be to ask the dispatcher for clarification rather than going on through that meet; isn't that true?

A    Well, you rely on your employees' information, you rely on your own information, and if you felt you have seen this engine or any member of the crew, that's all that's necessary.

Q    My question is if there is any question about a line 3 meet, before you choose to go through that meet point without seeing the train you're supposed to meet, a safer course of action would be to ask the dispatcher for clarification or instructions; wouldn't that be safer?

A    I assume it would, yes, sir.

Q    And the reason we know that, isn't it true, Mr. Crowley, is the dispatcher is telling you right here there is a train north of you coming south; that's what that line 3 means; isn't it?

A    That's right.

Q    So, when you, for whatever reason, I don't care what it is, but if for some reason the train 6131 thinks the dispatcher is wrong, then a safer course of action would be to ask the dispatcher about that. You would have to agree with that, wouldn't you?

A    I assume so, yes, sir.


In light of this record, we are of the opinion that a jury question was presented as to the negligence of defendant by and through his agents and/or employees.  The trial court did not err in submitting the case to the jury.


## II. The Expert Testimony Issues.


The next three issues raised by defendant deal with the admissibility of evidence from expert witnesses, or at least witnesses alleged to be experts.  While federal law controls substantive matters in a FELA case, in the absence of any interference with substantive rights or defenses under FELA, state rules governing the admissibility of evidence should apply.  Eubanks v. CSX Transp. Inc., et al, 478 S.E.2d 387, 390 (Ga. Ct. App. 1996), see also Hileman v. Pittsburgh & Lake Erie R.R. Co., 685 A.2d 994, 997 (Pa. 1996).  Consequently, in dealing with defendant's second and third issues pertaining to the admissibility of certain expert testimony, we will be applying, at least in part, Rule 702 and 703 of the Tennessee Rules of Evidence, which reads as follows:

**Rule 702**. **Testimony by experts.**—If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

**Rule 703. Bases of opinion testimony by experts.**—The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

While Tenn. R. Evid. 702 requires that the scientific or technical evidence "substantially assist the trier of fact," its federal counterpart, Fed. R. Evid. 702 requires only that the evidence "assist the trier of fact." "This distinction indicates that the probative force of the testimony must be stronger before it is admitted in Tennessee." McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 264 (Tenn. 1997).

In a similar vein, Tenn. R. Evid. 703 states that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." There is no similar restriction in the federal rule. Id. at 264-65.

In this state the qualifications, admissibility, relevancy and competency of expert testimony are matters which largely rest within the sound discretion of the trial court. However, this discretion is not absolute and may be overturned on appeal where the discretion is arbitrarily exercised. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

### A. Testimony of the Witness Runcie.

Plaintiff offered Dr. Dennis Runcie, a psychologist from Alabama as a witness, to give his expert opinion to the effect that decedent was suffering from fatigue at the time of the accident. Defendant's earlier motion *in limine* which sought to exclude this testimony was denied. When Dr. Runcie was called as a witness at trial defendant once again objected, but the motion was overruled.

Dr. Runcie is a psychologist who has studied the effects of fatigue on the decision-making processes of the human mind. Plaintiff sought to establish that the work schedule which defendant had required decedent to follow in the weeks preceding the accident caused decedent's

judgment to be clouded by fatigue on the day of his death. Defendant's objection to this testimony was based on two grounds: (1) that as a psychologist, Dr. Runcie was prohibited by T.C.A. § 63-11-204(a) and (c) from attempting to diagnose any <u>physical</u> malady, and (2) that his testimony was too equivocal and speculative to meet the burden of being able to "substantially assist" the trier of fact. We are of the opinion that both objections are well taken.

The relevant portion of the statute relied upon by defendant in seeking to exclude Dr. Runcie's testimony reads as follows:

> (a) Nothing in §§ 63-11-201--63-11-203 shall be construed as permitting the use of those forms of psychotherapy which involve the administration or prescription of drugs or electroshock *or in any way infringing upon the practice of medicine* as defined in the laws of this state.
>
> . . . .
>
> (c) A psychologist or psychological examiner must not attempt to diagnose, prescribe for, treat or advise a client with reference to problems or complaints falling *outside the boundaries of psychological practice.*
> Tenn. Code Ann. § 63-11-204 (1997) (emphasis supplied).

The definition of the practice of medicine as referred to in the statute above is set out in T.C.A. § 63-6-204(a)(1) as follows: "Any person shall be regarded as practicing medicine, within the meaning of this chapter, who treats, or professes to diagnose, treat, operates on or prescribes for any *physical ailment* or any physical injury to or deformity of another." (Emphasis supplied).

The following excerpt of Runcie's testimony demonstrates the physical aspects of fatigue:

> Q. Fatigue is a physical pathology, is it not?
> A. In part, yes.
> Q. In other words, if we are tired, that is physical?
>
> . . . .
>
> A. In part that is true.
> Q. The body reacts physiologically to fatigue?
> A. Yes, that is true.

While Dr. Runcie may be qualified to testify as to the psychological effects of fatigue on Plunk, we are of the opinion that he was not qualified to testify as an expert as to the physical existence of fatigue.

It might also be noted that prior to Runcie's testimony, no evidence had been presented to

13

indicate that decedent had experienced fatigue on the day of the collision. Conductor Crowley, who had known decedent for several years, testified that on that fateful day decedent seemed alert and did not appear to be fatigued. In addition, it should also be noted that Runcie's opinion was based entirely upon the number of hours worked during this period by decedent and the various start and stop times of decedent's shifts. His opinion was not based upon any examination of either decedent or his medical records or history.

Defendant also objected to the admission of Dr. Runcie's testimony regarding the issue of fatigue on the grounds that it provided no causal link between the alleged fatigue and the accident in question, and thus was highly speculative. The following excerpts from Dr. Runcie's testimony illustrates the point being made by defendant:

Q. Now, assuming those facts, do you have sufficient information to determine whether or not on February 26, 1994 at approximately 1:30 p.m. that Mr. Plunk was suffering the psychological effects of fatigue?
A. Yes, I do.
Q. Okay. And what is your opinion?
A. I would think, yes, very likely he did.

. . . .

Q. Based upon the assumptions that I read to you a moment ago, did you have enough information to go on to give an opinion as to whether the fatigue that Mr. Plunk suffered from at that time was a contributing factor in this train accident?
A. Yes. I think it is very likely.

. . . .

A. The likelihood, to me, that he was fatigued is very high. The linkage of that to causing the accident is, of course, not so strong. What I'm saying is that people that are in that state of fatigue are much more likely to have accidents. And that is the only link I've made.
Q. That is as far as you can go; correct?
A. Correct.

. . . .

Q. So let's make it clear. You are saying that someone working these many hours, as [Plunk] worked in February of 1994, is more likely to be fatigued. That is the number one thing you are saying?
A. Uh-huh, yes.
Q. The number two thing you are saying is that a person who is fatigued is more likely to make mistakes?
A. Yes.

. . . .

Q. The number three thing you are not saying is on February 26, 1994 fatigue made Jerry Plunk actually make a mistake that caused this wreck; you cannot go that far?
A. No. It is impossible to say that.

14

As stated by this court in <u>Primm v. Wickes Lumber Co.</u>, 845 S.W.2d 768, 770-71 (Tenn. Ct. App. 1992):

> The expert's opinion must substantially assist the jury in its determination and the question of what will "substantially" assist the jury is one for the trial court to determine. The expert's testimony must satisfy Rule 702 and the threshold question for the court's determination is whether the witness' testimony "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." The Tennessee standard is much more stringent than its federal counterpart which merely requires evidence from experts which "assist the trier of fact" rather than "substantially assist the trier of fact." The importance of the court's task in determining whether the evidence will substantially assist the trier of fact is borne out by the weight given to an expert's testimony. "Expert testimony is unique because experts are allowed to give an opinion in a particular situation whereas other witnesses are prohibited from giving opinion testimony in areas where expertise is not required."
>
> . . . .
>
> Numerous Tennessee cases establish a necessary degree of medical certainty to prove causation. Testimony which amounts to mere speculation is not evidence which establishes proximate cause.
>
> We find nothing in the record or in the deposition which shows that the plaintiff laid the necessary foundation to prove medical expert causation. There is no evidence to establish with a reasonable degree of medical certainty that plaintiff's heart attack and bypass surgery in 1990 resulted from the accident with defendant.
>
> . . . .
>
> Testimony of experts as to the probable cause of injury should be subject to the same rules as applied supra in the case of probable effect of injury. (Citations omitted)(footnote omitted).

We find nothing in this record that shows that the plaintiff laid the necessary foundation to prove causation. See <u>id.</u> at 771, <u>Lindsey v. Miami Development Corp.</u>, 689 S.W.2d 856, 862 (Tenn. 1985), <u>Porter v. Green</u>, 745 S.W.2d 874, 877 (Tenn. Ct. App. 1987).

We are of the opinion that due to the speculative nature of this testimony, it did not stand up to the requirements of Rule 702 and "substantially assist the trier of fact." The trial court abused its discretion in admitting the testimony of Dr. Runcie. Having so determined, following the mandate of Rule 36(b), T.R.A.P., we are of the opinion that the admittance of this testimony "more probably than not affected the judgment" in this case. We therefore hold that this error was a reversible error and as a result thereof, we remand this case to the trial court for a new trial.

**B. Testimony Pertaining to "Good Railroad Practice", etc.**

Defendant contends that the trial court erred in allowing plaintiff to introduce testimony by three employees of defendant railroad, said witnesses being offered as "experts" who testified to the issue of "good railroad practice," in addition to giving testimony as to whether it would be safer for railroad to have followed different operating procedures than those in place at the time of the accident.

Three employees of defendant were called to testify in regard to the above named subjects. They were Q. B. Gray, the engineer on the train that was struck by decedent's locomotive; Royce Crowley, the conductor of decedent's train; and James Whitaker, who had worked for defendant railroad for a number of years as brakeman, flagman, fireman, conductor, and engineer.

Defendant's objection to the trial court's allowing these three employees of defendant to testify as expert witnesses is twofold. First, defendant contends that none of these witnesses were qualified as an expert so as to permit him to testify as to what he believed to be "good railroad practice." The second objection deals with the substance of what the witnesses testified to, namely, what procedures they considered to be "safer" than the rules and regulations of defendant which existed at the time of the accident.

As for each of these three witnesses, their testimony as to what was "good railroad practice" amounted to their stating their opinions as to how defendant could have made a specific method of procedure more safe. The following testimony by witness Q. B. Gray demonstrates the point we have attempted to make:

Q. In your opinion was it good railroad practice to use Cynthia as a meet point based on your years of experience on the railroad?
A. Well, I don't know of any other -- I mean, Cynthia was a -- that was a designated siding. That is a meeting point for trains.
Q. But in your opinion was it good railroad practice to use it as a meet point?
A. It would have been a good place to meet trains. The operating procedure and the rules that they use to meet there could have -- should have had some changes made in them.

. . . .

Q. I think you said the railroad did not require the dispatcher to give the other train that is going to be met with the track permit the location of that other train at the time that the track permit was given?
A. No, sir. There is no requirement that he do that.
Q. In your opinion, would it have been good railroad practice, based on your twenty-three years experience with the railroad, that the railroad do require that information be given?

A.      It would have been a lot safer if the dispatcher had coordinated the meets with the trains and let everybody know where the other train was.

In the opinion of this court, this testimony is flawed and detrimental to the defendant for several reasons. First of all, none of these three witnesses were qualified to give the testimony that they gave. The sum and substance of the experience of each of them showed that their experience in railroading was acquired solely as employees of defendant in various positions as trainmen, from flagman all the way up to engineer or conductor. There was no testimony that any of them were familiar with the operations of any other railroad. There was no testimony that any of them had been trained in railroad safety. There was no testimony that any of them had any knowledge of or was familiar with the railroad industry in general insofar as it pertained to the subjects about which they testified. Accordingly, they were not qualified to testify as experts regarding industry standard or "good railroad practice."

As can be noted from the excerpts of testimony above, it can be seen that in seeking to testify regarding "good railroad practice," each witness in his own way would state that such-and-such procedure or practice would be safer than defendant's current procedure or practice, with the implication that this is what the defendant should have done to prevent this accident from happening. The admission of this testimony was flawed for several reasons, even if it be assumed that one or more of the witnesses were qualified as experts to so testify.

Any case presented by an employee under FELA must include all the same elements as are found in a common-law negligence action. Ewing v. St. Louis Southwestern R.R. Co., 772 S.W.2d 774, 775 (Mo. Ct. App. 1989). Under the FELA, the employer is not made an insurer of the safety of its employees while they are carrying out their duties. As stated in Atlantic Coast Line R. Co. v. Dixon, 189 F.2d 525, 526-27 (5th Cir. 1951):

> The employer is not held to an absolute responsibility for the reasonably safe condition of the place, tools and appliances, but only to the duty of exercising reasonable care to that end, the degree of care being commensurate with the danger reasonably to be anticipated. . . . Except as otherwise provided in the Act, liability is determined by common law principles which define negligence as lack of due care in the circumstances.
>
> . . . .
>
> The test is not whether the tools to be used and the place in which the work is to be performed are absolutely safe, nor whether the employer knew the same to be unsafe, but whether or not the employer has exercised reasonable care and

17

diligence to make them safe.

. . . .

The employer is not required to furnish the employee the latest, best, or most
perfect appliances with which to work, nor to discard standard appliances already
in use upon the discovery of later improvements, provided those in use are
reasonably safe and suitable.
(Citations omitted).

Furthermore, assuming first of all that the witnesses had been qualified as experts in this area, which we find they were not, and assuming that they did testify as to the customs of other railroads in the region in handling railroad traffic such as in the case under consideration, which they did not, to have given proper protection to defendant the jury should have also been instructed that custom was not controlling and that the customary way may or may not involve negligence, but that it could be considered along with other facts and circumstances of the case. See Thompson v. Camp, 163 F.2d 396, 402 (6th Cir. 1947). No such instruction was given in the case at bar.

There are cases from other jurisdictions that support the conclusions that we have reached regarding this testimony. One is Stillman v. Norfolk & Western Ry. Co., 811 F.2d 834 (4th Cir. 1987). The basic facts are these: the plaintiff was employed by railroad as an apprentice car-man, which included installing large, heavy gears in railroad cars. The installation was by means of a forklift. One day while a gear was suspended from the blades of a forklift, it quit operating. With the gear still suspended from the forklift, the plaintiff placed himself partially under the blades of the forklift and attempted to free the chain. At this point the blades fell on him and injured him. Following a jury verdict for the railroad, the plaintiff appealed. On appeal, the plaintiff contended that the district court committed prejudicial error in excluding his proffered testimony concerning a safer, alternative way to install gears in railroad cars. In affirming the district court, the court of appeals stated:

We think that the district court acted properly in sustaining the Railroad's
objection to Stillman's testimony concerning a safer, alternative way to install
gears in railroad cars. As the district court correctly observed, the question the
jury had to decide was whether the Railroad had exercised reasonable care for the
safety of Stillman, not whether the Railroad could have employed a safer method
for installing gears.

In Taylor v. Illinois Cent. R.R. Co., 8 F.3d 584 (7th Cir. 1993), Taylor, a conductor on a

train of defendant, attempted to board the train while it was being moved at approximately seven to ten miles an hour. At the point he attempted to board, the ground underneath the tracks consisted of "mainline" ballast, which is primarily limestone or other rocks between one to three inches in diameter. As he attempted to board the train, his left foot slipped, which resulted in a broken leg. One of the plaintiff's contentions was that the railroad was negligent in not using "yard" ballast, a smaller ballast consisting of smaller rocks, in lieu of the mainline ballasts. The plaintiff contended that yard ballast would have provided a safer and more stable footing than the larger mainline ballast.

The plaintiff sought to introduce the testimony of an expert witness regarding unsafe ballast conditions. The witness had worked for another railroad for over forty years, during which time he had served as a conductor, brakeman, trainmaster and a variety of other positions. He was not, however, an engineer and had never worked in the Maintenance of Way Department, the department responsible for the ballast underneath the tracks. The witness' testimony sought to be offered dealt with the different ballast sizes and would have stated that the plaintiff's accident likely could have been prevented had the railroad spread smaller ballast on top of the larger ballast. The trial court granted the railroad's motion to exclude the witness' testimony. The exclusion of this evidence was affirmed by the Court of Appeals on several grounds. One point is relevant here, in that the plaintiff contended that the witness' testimony about other locations using smaller ballast would have proven that there was a safer alternative. In response to that, the court stated that: "However, proof of a safer alternative is not necessarily proof of negligence—Illinois Central could have provided a reasonably safe workplace notwithstanding the fact that safer workplace alternatives exist." Id. at 586.

As already stated, we are of the opinion that the trial court erred in admitting this testimony from all three of plaintiff's witnesses. We also are of the opinion that this error involved a substantial right of defendant, its negligence or at least the degree and extent of its negligence, and "more probably than not affected the judgment." Our conclusion as to this error also requires that the case be remanded for a new trial.

### C. Testimony of Plaintiff's Economist.

Prior to trial, defendant filed a motion *in limine* seeking to exclude the testimony of Dr. Fred Johnson, an expert economist, on the grounds that it was inadmissable due to his failure to

properly calculate the future earnings of decedent. This motion was denied. When Dr. Johnson was presented at trial as a witness, defendant's objection to his testimony was overruled. From reading the transcript in this regard, it appears that the sum and substance of defendant's objection was that Dr. Johnson did not adjust his final figures of the amount of lost future earnings by taking into account certain retirement taxes based upon the payroll, paid by both decedent and the railroad. Under the Railroad Retirement Act, there are two levels of withholding in regard to an employee's wages: Tier I and Tier II. Defendant's specific objection to Dr. Johnson's testimony was that he did not reduce his estimate of decedent's future earnings by the amount which would have been deducted from decedent's paycheck under the Act.

While the record reflects that Dr. Johnson did not include specifically Tier I and Tier II taxes in his computations, he explained at length that this omission was due to the offsetting payment by the railroad which, in effect, made the withdrawals under Tiers I and II negligible when calculating decedent's future income.

In Norfolk & Western Ry. Co. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), the Supreme Court held that questions concerning the measure of damages in a FELA action are federal in character. This rule was to be applied thereafter even though the suit was brought in state court. Id. at 493-94. In United States v. L.E. Cooke Co., Inc., 991 F.2d 336, 342 (6th Cir. 1993), the court said:

> Where an expert's testimony amounts to "mere guess or speculation," the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis. . . . any weaknesses in the factual basis of an expert witness' opinion, including unfamiliarity with standards, bear on the weight of the evidence rather than on its admissibility.
> (Citations omitted).

The record reflects that defendant's counsel cross-examined Dr. Johnson in length pertaining to the calculations he had made and the various data he utilized that formed the basis of his estimate of decedent's future income. In our opinion, the trial court did not abuse its discretion in overruling defendant's motion and thereby admitting into evidence the testimony of Dr. Johnson.

### III. The Conflict of Interest Issue.

This last issue raised by defendant is somewhat unusual. However, because it involves

20

the question of the ethical conduct of a nonresident attorney, who nonetheless is a member of the Tennessee Bar, we feel this should be addressed. While this case was still under the jurisdiction of Judge Wyeth Chandler, counsel for defendant filed a motion asking the court to disqualify Frank O. Burge, Jr., and all associated counsel, from representing plaintiff, alleging that they were representing a conflict in interest. The interests at that time were not named.

The record reflects that Gray and Gandy, the engineer and conductor respectively on the southbound train that was struck head-on by the train driven by Plunk, are represented by Mr. Burge in suits filed in the state of Mississippi, which contain complaints with allegations that defendant was vicariously liable because of the negligence of its own employees, Plunk and Crowley.

Ultimately, Judge Chandler entered an order directing that Mr. Burge and Steven Leffler should withdraw from their representation of Royce E. Crowley in his personal injury suit against defendant railroad in Tennessee. In addition, they were directed to "change the allegations of the subject Mississippi cases in such a way as to dismiss allegations of negligence against any other plaintiffs in all cases."

The record reflects that plaintiff's counsel subsequently withdrew from their representation of Crowley in his personal injury suit in Tennessee. The record reflects that prior to trial, after Judge McCarroll assumed jurisdiction over this case, counsel for defendant filed a motion seeking to have the court compel plaintiff to "dismiss any and all allegations of negligence against the plaintiffs in all the cases arising out of the incident from which this suit arose." No order has been entered as of the appeal of this case in response to this motion.

Counsel for defendant asserts that "plaintiff's counsel repeatedly represented to the trial court that he had withdrawn allegations of vicarious liability due to the acts of Plunk and Crowley in the Gray and Gandy cases." The record reflects that this matter was submitted to Lance Bracy of the Tennessee Board of Professional Responsibility by Judge McCarroll for an independent assessment and for recommendations to the trial court. After reviewing the "factual scenario" submitted by the trial judge to the Board, the Board responded in a lengthy report and concluded at that time that "from the sole perspective of the disciplinary rules, however, Disciplinary Counsel sees no conflict of interest between the various claims of vicarious liability in this litigation."

In his report to the trial court, the Chief Disciplinary Counsel of the Board pointed out that ordinarily the issue of conflict of interest was not designed to be utilized by the opposing party, regardless of motive. We have no quarrel with this statement. However, inasmuch as we have the privilege of looking at this record after the fact, there were some factual developments that took place that did not exist at the time the memorandum was submitted to the Disciplinary Board.

This is a complex set of circumstances, and inasmuch as the practice of counsel for plaintiff has been called into question in both the trial court and in this court, without passing judgment either way, we are of the opinion that now that the underlying case has been tried and heard on appeal, it should be looked at in its totality and a decision reached based upon all the facts that might be available. Accordingly, when a final order is entered in this appeal, either by this court or in the event of an appeal to the Supreme Court, we respectfully direct the clerk of the court to send the appropriate portions of this record to the Board of Professional Responsibility for review. In addition, we respectfully request and recommend that counsel for both plaintiff and defendant work together in abridging this record, inasmuch as there are hundreds of pages to the transcript, and a three volume technical record.

In sum, for the reasons herein stated, the judgment of the trial court is reversed, the jury verdict is set aside, and this case is remanded to the Circuit Court of Shelby County for a new trial, not inconsistent with the provisions of this opinion. Costs in this cause are taxed one-half to plaintiff and one-half to defendant, for which execution may issue if necessary.

_____
TOMLIN, S.J., W.S.


_____
CRAWFORD, P.J. W.S.          (CONCURS)


_____
LILLARD, J.          (CONCURS)

22